UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**MELISSA D. JONES**,                    Case No. 1:10 CV 2590

        Plaintiff,                    Magistrate Judge James R. Knepp, II

    v.                    MEMORANDUM OPINION AND ORDER

**COMMISSIONER OF SOCIAL SECURITY,**

        Defendant.

### INTRODUCTION

Plaintiff Melissa D. Jones appeals the administrative denial of supplemental security income (SSI) under 42 U.S.C. § 1383. The district court has jurisdiction over this case under 42 U.S.C. § 1383(c)(3). The parties have consented to the exercise of jurisdiction by the undersigned in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 19). For the reasons given below, the Court affirms the Commissioner's denial of benefits.

### BACKGROUND

Plaintiff filed an application for SSI on February 7, 2006, alleging a disability onset date of June 1, 2005. (Tr. 235, 268, 272). Her claim was denied initially (Tr. 249–251) and on reconsideration (Tr. 253–255). She then requested a hearing before an Administrative Law Judge (ALJ). (Tr. 256). Born in April 1970, Plaintiff was 38 years old at the time of the ALJ's hearing. (Tr. 20, 32, 513). She attended school only up to ninth grade, and has received limited special job training or vocational schooling. (Tr. 60, 102, 133, 514). She has prior work experience as a cashier and as a home health aid. (Tr. 67).

This is not Plaintiff's first time applying for benefits. She filed an SSI application in September 2001 (Tr. 43–45) that was also denied initially and upon reconsideration (Tr. 32–41). She

also requested review by an ALJ, who affirmed the denial in September 2004. (Tr. 42, 239–248). However, she did not file a lawsuit appealing the denial of this initial application.

As an initial matter, the Court notes that the Commissioner's decision on Plaintiff's first application is final and binding. 20 C.F.R. § 404.955. This decision must be given *res judicata* effect. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1232 (6th Cir. 1993) (citing *Carver v. Sec'y of Health & Human Servs.*, 869 F.2d 289, 291–292 (6th Cir. 1989)). Accordingly, it is Plaintiff's burden "to show by clear and convincing evidence" that she was disabled during the time subsequent to her denial. *Id.* "[W]hen a plaintiff previously has been adjudicated not disabled, she must show that her condition so worsened in comparison to her earlier condition that she was unable to perform substantial gainful activity." *Id.* The Court will therefore treat medical evidence in the record prior to Plaintiff's first denial as establishing only a basis for such comparison, not as direct evidence of disability. The relevant date here, the date of the first ALJ's denial, is September 24, 2004. (Tr. 237).

First Application Medical History

Plaintiff's main medical issues stem from diabetes, costochondritis, depression, and high blood pressure. (Tr. 32, 54, 88, 104, 139). She has reported difficulty breathing (Tr. 76, 87, 89), an inability to concentrate (Tr. 84), an aversion to being around people (Tr. 80), and a lack of motivation to groom or dress herself (Tr. 81). There is also evidence in the record indicating Plaintiff is a recovering alcoholic. (Tr. 133).

Plaintiff's long and detailed medical history is replete with visits to the emergency room. In August 2000, Plaintiff visited the ER at Amherst Hospital, complaining of a headache and severe pain in her hands. (Tr. 104). Treatment notes indicated Plaintiff's hands were swollen, the right hand

more so than the left. (Tr. 104). She was treated with pain killers and discharged in stable condition with instructions to avoid caffeine. (Tr. 104, 105, 110). Plaintiff returned to the ER in January 2001 with a pulled muscle in her back. (Tr. 115). She was once again treated with pain killers and discharged after mostly normal findings. (Tr. 116, 117).

In February 2001, Plaintiff went back to the ER, complaining of pain in her tongue. (Tr. 123, 124). She was instructed to remove her tongue piercing due to a localized infection, and prescribed antibiotics. (Tr. 124, 127). Soon thereafter, she returned to the ER with a rash and was diagnosed with anxiety, hyperglycemia, and diabetes. (Tr. 130). In August 2001, Plaintiff went to the ER complaining of numb finger tips, difficulty breathing, and dizziness. (Tr. 131). The attending physician noted a high blood sugar level, and insulin was given to Plaintiff. (Tr. 131).

Plaintiff's primary care physician for several years was Lavinia Cozmin, M.D. (Tr. 141). Dr. Cozmin treated Plaintiff throughout the late 1990s for various minor ailments (165–174) that included complaints of severe back pain (Tr. 174, 175) and insomnia (Tr. 172). She diagnosed Plaintiff with costochondritis and provided her with information on the condition. (Tr. 187). In December 1999, Dr. Cozmin wrote a letter to Plaintiff's health insurance company seeking coverage for home glucose monitoring equipment because Plaintiff is diabetic and needs to keep a close watch on her blood sugars daily. (Tr. 152).

Dr. Cozmin referred Plaintiff to a counselor in July 2000 for her depression. (Tr. 149). She had previously noticed Plaintiff's increased irritability, mood swings, and erratic temperament. (Tr. 150, 169). In October 2000, Plaintiff saw Dr. Cozmin because of flu symptoms, but also complained of wrist and shoulder pain. (Tr. 148). At that time, Dr. Cozmin noted tenderness in Plaintiff's wrists and recommended she use wrist splints. (Tr. 148).

3

In January 2001, Plaintiff complained to Dr. Cozmin of pain that felt like someone crushing her chest. (Tr. 146). She said it felt like someone was giving her a bear hug. (Tr. 146). Dr. Cozmin noted Plaintiff was doing well on Prozac. (Tr. 146). On examination, she found "no spinal tenderness" and slight tenderness in Plaintiff's chest over her sternum. (Tr. 146). She concluded Plaintiff's upper back and chest pain was caused by her costochondritis. (Tr. 146).

In March 2001, Plaintiff complained of tenderness in her kidney area and rib pain. (Tr. 145). Dr. Cozmin reported Plaintiff was not complying with her diet and had not been controlling her insulin levels. (Tr. 145). She also reported Plaintiff had pain in her sternum and upper back. (Tr. 159). In May 2001, Plaintiff visited Dr. Cozmin for a check-up, stating that she felt well. (Tr. 143). Dr. Cozmin noted slight tenderness on palpation of the right costovertebral joints, but otherwise found Plaintiff to be "well, pleasant". (Tr. 143).

In August 2001, Plaintiff complained to Dr. Cozmin that her costochondritis was "acting up". (Tr. 141). Dr. Cozmin was able to reproduce the pain Plaintiff complained of by having her take a deep breath. (Tr. 141). She also reported finding tenderness to palpation in Plaintiff's chest. He prescribed tylenol with codeine for Plaintiff's costochondritis pain, and lowered her daily regimen of insulin. (Tr. 141).

Plaintiff returned to Dr. Cozmin in November 2001, at which point Dr. Cozmin reported a nodule on Plaintiff's neck that had been present for more than two years but appeared to be getting larger. (Tr. 140). Plaintiff also complained of squeezing rib pain, which Dr. Cozmin attributed to her costochondritis. (Tr. 140).

A psychological evaluation from November 2001 reported Plaintiff has a "flat affect and depressed mood", and sometimes hears voices. (Tr. 134, 135). Psychologist Thomas F. Zeck, Ph.D.,

diagnosed Plaintiff with depressive neurosis and determined she has borderline intellectual functioning. (Tr. 136). Dr. Zeck recommended she try "a fairly simple job with very minimal pressure". (Tr. 137).

Plaintiff's mental residual functional capacity (RFC) was also assessed by psychologist Catherine Flynn, Psy. D., in December 2001. (Tr. 189–201). Dr. Flynn found moderate limitations in Plaintiff's ability to understand, remember, and carry out detailed instructions, her ability to complete a workweek without interruption from psychological symptoms, and her ability to maintain concentration, persistence, or pace. (Tr. 189–190, 198). Dr. Flynn concluded Plaintiff has the medically determinable impairment of depressive neurosis. (Tr. 194). She categorized her medical disposition under the listings for affective disorders and mental retardation, reporting Plaintiff has significantly sub-average general intellectual functioning. (Tr. 193, 195).

Plaintiff began seeing Jessica Griggs, D.O., as her primary care physician in the years leading up to her initial SSI denial. (Tr. 214). In November 2003, Dr. Griggs referred Plaintiff to individual counseling at the Nord Center regarding her sleep hygiene and for reduction of depressive symptoms such as her violent ideations, decreased appetite, and moodiness. (Tr. 214–234). Plaintiff's counseling records indicate she was in the "alcohol/drug" population, and did not return to complete her counseling goals. (Tr. 215). She reportedly relapsed on alcohol before Dr. Griggs suggested she attend therapy. (Tr. 223). The social worker who oversaw Plaintiff's counseling reported Plaintiff did not seek intervention and labeled her involvement in problem solving as "non-existent". (Tr. 215). During this period of counseling, Plaintiff was reported to be smoking one pack of cigarettes per day and drinking six shots twice a month, though she did not acknowledge substance dependence. (Tr. 225). Plaintiff's counselors noted a history of alcohol abuse, and

5

reported Plaintiff admitted to binge drinking. (Tr. 225, 232). Treatment records reflect a diagnosis of depressive disorder and alcohol abuse. (Tr. 232).

Urinalysis showed Plaintiff's urine to be contaminated with gram positive bacteria in January 2003. (Tr. 372).  Dr. Griggs treated her for this urinary tract infection, and reported Plaintiff had been taking her brother's Vicodin for pain. (Tr. 470). Dr. Griggs then referred Plaintiff to urologist Yih-Wen Lai, M.D., whom Plaintiff saw in June 2003, because of frequent urinary tract infections. (Tr. 202–204). The medical records indicate Plaintiff complained of having kidney infections every two or three months for almost seven years. (Tr. 204, 208, 372). On examination, Dr. Lai found marked tenderness, though urinalysis showed no sign of infection at that time. (Tr. 204). Dr. Lai suggested a cystoscopy and a CAT scan. (Tr. 202, 204).

In the summer of 2003, Plaintiff complained of back pain (Tr. 206, 207) and tightness in her chest (Tr. 205). She also had her right wrist x-rayed, revealing no fractures, dislocations, or significant degenerative changes. (Tr. 435). Similarly, a chest x-ray from February 2004, conducted because of Plaintiff's right-sided chest pain began radiating into her shoulder with shortness of breath, revealed a normal size heart and pulmonary vascularity. (Tr. 430). Plaintiff's lungs were clear and fairly well-expanded with a normal thorax and pleural reflections. (Tr. 430). C.H. Miller, M.D., concluded Plaintiff had no active chest disease and no significant change since March 2002. (Tr. 430).

At an office visit in March 2004, Dr. Griggs reported Plaintiff had been noncompliant with her recommended diet and medications. (Tr. 467). She explained to Plaintiff the importance of compliance because of possible diabetes complications. (Tr. 467). Dr. Griggs found tenderness to palpation in Plaintiff's sternum. (Tr. 467). Plaintiff saw Dr. Griggs again in May 2004 and

6

complained of "unbearable pain" in her right wrist. Dr. Griggs noted a past fracture, and renewed Plaintiff's Vicodin prescription. (Tr. 466).

Plaintiff underwent x-rays of her chest and thoracic spine again in July 2004 because of interscapular pain. (Tr. 420). Fredrich Dengel, M.D., interpreted the x-rays and reported no effusion, no adenopathy, no worrisome pulmonary nodules or lung masses, and a normal cardiac and aortic silhouette. (Tr. 420). He also reported no paravertebral abnormality and a normal vertebral height and disk space. (Tr. 420). Plaintiff then had her right wrist x-rayed in August 2004 to assess whether she had fractured anything after falling. (Tr. 419). Radiologist David Stout, M.D., read the x-rays and reported minimal osteoarthritic changes and no fractures or dislocations. (Tr. 419).

In March 2004, Plaintiff's physical RFC was assessed by Dr. Griggs. (Tr. 209–213). Dr. Griggs reported Plaintiff had costochondritis, uncontrolled diabetes due to noncompliance with medications, and depression. (Tr. 209). She said Plaintiff is not a malingerer and experiences pain often, but is nonetheless capable of low stress jobs. (Tr. 210). Dr. Griggs opined Plaintiff could walk four or five city blocks without rest or severe pain, and sit or stand continuously for more than two hours. (Tr. 211). She said Plaintiff could rotate between sitting, standing, and walking for at least six hours during an eight-hour workday. Though Dr. Griggs said Plaintiff would not need a job which permits her to shift positions at will, she suggested Plaintiff would need to take unscheduled breaks of about fifteen minutes twice a day. (Tr. 211).

In response to a form question that asked, "With prolonged sitting, should your patient's leg(s) be elevated?" Dr. Griggs checked "No". (Tr. 212). She also checked "No" to say Plaintiff does not need a cane, does not have "good days" and "bad days", and does not have significant limitations in doing repetitive reaching, handling, or fingering. (Tr. 212).

First Application Decision

Plaintiff's initial SSI application was denied by the ALJ on September 24, 2004. (Tr. 237–248). In his opinion, the ALJ considered evidence of Plaintiff's costochondritis, depression, diabetes, hyperglycemia, urinary tract infections, and high blood pressure. (Tr. 241–242). He reviewed Plaintiff's various RFC assessments, psychological evaluations, treatment, and counseling records. (Tr. 242–243). He concluded Plaintiff's severe impairments did not meet or medically equal a listed mental impairment because the evidence did not establish paragraph C criteria. (Tr. 243).

The ALJ determined Plaintiff's treatment records did not establish the wrist limitations, carpal tunnel syndrome, or ongoing respiratory problems Plaintiff subjectively alleged. (Tr. 244–245). He gave special attention to the Nord Center records showing Plaintiff had relapsed and had episodes of binge drinking, but also reporting Plaintiff had appropriate mood and affect, coherent speech, good hygiene, good insight, fair judgment, good concentration, and good memory. (Tr. 245). This evidence, the ALJ reasoned, showed Plaintiff's depression did not disable her. Ultimately, the ALJ said, "No treating source refers to [Plaintiff] as having incapacitating or debilitating symptoms that would prevent her from returning to the workplace." (Tr. 245). The ALJ deferred to Dr. Griggs' RFC assessment and concluded Plaintiff could carry 50 pounds occasionally and 25 pounds frequently, and could sit, stand, or walk for between six to eight hours in an eight-hour workday. (Tr. 246). Because she was capable of the full range of medium work, there were some 2,500 unskilled occupational categories the ALJ determined she could perform work in. (Tr. 247). Thus, Plaintiff was found not disabled. (Tr. 248).

Second Application Medical History

Since the first determination, Plaintiff has alleged additional impairments stemming from a broken vertebrae, arthritis, a herniated disk, difficulty breathing, a personality disorder, depression, bursitis in her right arm, and pain in her rib cage. (Tr. 290, 303, 307, 312, 322). Plaintiff told SSA she needs help getting out of bed some days because of her pain. (Tr. 296). On a day-to-day basis, Plaintiff's main physical problem is with her back. (Tr. 374).

An SSA employee, who interviewed Plaintiff face-to-face, filled out a disability report the same day Plaintiff filed her 2006 SSI application. (Tr. 288). The report indicated Plaintiff had no difficulty hearing, reading, breathing, understanding, concentrating, talking, answering, sitting, standing, seeing, using her hands, or writing. (Tr. 288). It did indicate, however, that Plaintiff had difficulty walking. (Tr. 288). Specifically, it said Plaintiff "had to waddle a little while walking". (Tr. 288).

In August 2004, Plaintiff began complaining to Dr. Griggs that her "costochondrits is back", causing pain in her chest. (Tr. 465). Dr. Griggs noted tenderness to palpation of Plaintiff's sternum and continued her on Vicodin for pain. (Tr. 465).

In April 2005, Plaintiff had transabdominal and transvaginal pelvic ultrasounds conducted because she reported having right sided pelvic pain and irregular menses. (Tr. 369). The sonographic images showed nothing abnormal, though radiologist David P. Stout, M.D., reported a one-centimeter nabothian cyst. (Tr. 369). Dr. Stout declared the ultrasound negative. (Tr. 369).

Plaintiff was admitted to the emergency room at Amherst Hospital in May 2005 with a swollen left hand after reportedly having it slammed in a window. (Tr. 326–333). The attending physician noted Plaintiff was calm and acting appropriately. (Tr. 327). On examination, Plaintiff's left hand was found to be numb and have a limited range of motion. (Tr. 327). X-rays revealed

normal findings. (Tr. 332). She was diagnosed with a contusion on three fingers and sent home in stable condition. (Tr. 328, 329, 331, 333).

Plaintiff returned to the emergency room at Amherst Hospital in July 2005, this time complaining of pain in both shoulders and her back, as well as frequent urination and burning on urination. (Tr. 334, 335, 338). Treatment notes show Plaintiff had pain on acute movements, but not on palpation. (Tr. 339). Urinalysis showed only trace amounts of bacteria present in Plaintiff's urine. (Tr. 340, 342). X-rays of Plaintiff's cervical spine, taken because of her shoulder pain, showed a satisfactory alignment with disc spaces maintained and intact bones and soft tissues. (Tr. 343). Plaintiff was prescribed Darvocet for her pain and discharged in stable condition with instructions to avoid alcohol and tobacco smoke. (Tr. 344–345).

In August 2005, Plaintiff saw Dr. Griggs who then found tenderness to palpation of Plaintiff's sternum. (Tr. 460). The same month, Plaintiff underwent a CT scan of her abdomen and pelvis because she had been having abdominal pain. (Tr. 363). The radiologist interpreting these scans reported finding no masses, stones, inflammatory changes, diverticulitis, or appendicitis. (Tr. 363). A vascular phlebolith in the hemipelvis was noted, though. (Tr. 363).

Plaintiff went to the ER at Amherst Hospital again in September 2005, complaining again of shoulder pain. (Tr. 346, 347). Limited range of motion was noted (Tr. 347), but no swelling or deformity was seen (Tr. 351). Plaintiff was prescribed Vicodin for her pain and discharged in stable condition. (Tr. 352). Plaintiff then followed up with Dr. Griggs, who noted some mild acromioclavicular joint arthrosis and mild thickening in the tendon structures of the rotator cuff. (Tr. 360). Dr. Griggs noticed a focus of fluid signal within the tendon, "suggesting a very small interstitial tear." (Tr. 360). The impression Dr. Griggs reported was "some tendinopathy and

10

possibly some partial interstitial tearing in the supraspinatus tendon, but no evidence of a full thickness tear". (Tr. 360). At a follow up, Dr. Griggs referred Plaintiff for an orthopedic consultation. (Tr. 458).

Between November 2005 and June 2006, Plaintiff was seen and treated regularly at the Comprehensive Pain Care Center in Lorain, Ohio. (Tr. 378–396). Plaintiff was referred to the Center for an evaluation of her injuries by Dr. Griggs. (Tr. 391). At her initial consultation, Plaintiff reported chest, shoulder, and lower back pain of an eight on a scale of zero to ten. (Tr. 391). She also complained of headaches that last all day. (Tr. 392). At that time, Plaintiff admitted she was taking three Vicodin pills every four hours even though she had only been prescribed one pill every six hours. (Tr. 391, 460). After a thorough examination (Tr. 393–395), Bharat Shah, M.D., diagnosed lumbar spine pain, unspecified thoracic or lumbosacral neuritis or radiculitis, shoulder joint pain, and Tietze's disease. (Tr. 395). Dr. Shah noted a previous shoulder MRI that revealed mild acromioclavicular joint arthrosis. (Tr. 395). He then ordered images of Plaintiff's lumbar spine. (Tr. 395).

Plaintiff underwent a CT scan of her lumbar spine in November 2005 pursuant to Dr. Shah's order. (Tr. 355). On the images, Dr. Shah saw no evidence of significant disc bulging, protrusion, or compression at the L1-L2 and L2-L3 levels. (Tr. 355). He reported compression of the thecal sac or nerve root sleeves at L3-L4, and diffuse minimal posterior bulging at L4-L5 without compression or stenosis. (Tr. 355). At the L5-S1 level, Dr. Shah noted some deformity and fragmentation of the left L5 interarticularis with some hypertrophy and increased sclerosis of the right L5 pars. (Tr. 355). He said this suggested an acute fracture through the left pars interarticularis "that appears to impinge upon the left L5 lateral foramen". (Tr. 357). He indicated there may also be nerve root compression

at L5 or S1 but that this was "not certain" from the CT scan. (Tr. 357).

Plaintiff returned to the Pain Center in December 2005. (Tr. 388). She then rated her lower back pain as a ten on a scale of zero to ten. (Tr. 388). Nonetheless, Dr. Shah characterized her back pain as being "well controlled". (Tr. 390). He noted her lumbar spine MRI showed a pars intra-articular defect, and that she continued to have pain in both hips from what Dr. Shah believed to be great trochanter bursitis. (Tr. 390). He prescribed a trial drug and suggested doing trigger point injections at a later time. (Tr. 390). When Plaintiff returned for a follow up in January 2006, the pain had not subsided, so Dr. Shah increased the dosage of one of Plaintiff's medications. (Tr. 387). Two months later, Plaintiff returned and Dr. Shah reported she had "good pain control". (Tr. 384).

At Plaintiff's last visit to the Pain Center, in June 2006, she stated that her lower back pain had "greatly improved", though she still complained of severe shoulder pain and moderate pain in her right arm. (Tr. 378). Dr. Shah wrote Plaintiff's right shoulder pain "seems to be bursitis pain", and he suggested she continue with the medications with the possibility of doing serapin injections in the future if she did not improve. (Tr. 381).

Plaintiff had urinary tract infections in May 2005 and February 2006, confirmed by urinalysis. (Tr. 356, 461). Dr. Griggs treated her for these. (Tr. 457, 461). Plaintiff also had various unrelated medical imaging done that is included in the record. For instance,  Plaintiff had x-rays of her right knee taken in November 2004 because of a palpable lump found by Dr. Griggs. (Tr. 404). The x-rays showed no joint effusion and no bone or joint abnormality. (Tr. 404). They did, however, show a small Pellegrini-Stieda deformity. (Tr. 404). Similarly, after reportedly "attempting to break up a dog fight" in August 2006, Plaintiff had x-rays of her left hand taken. (Tr. 403). These x-rays were also negative for fractures or dislocations. (Tr. 403). And, because of chest pain in May 2008,

12

Plaintiff underwent x-rays of her chest, showing Plaintiff's heart and lungs to be normal sized and contoured. (Tr. 498). According to the reading radiologist, Paresh X. Arora, M.D., no evidence of active cardiopulmonary disease was found. (Tr. 498).

Plaintiff was seen by social worker Klare Heston in November 2005, at which point Plaintiff reported depression because she had recently lost her step-father, to whom she was very close, to suicide. (Tr. 453). Ms. Heston noted Plaintiff has a history of trauma in her life. (Tr. 453). Records from the Nord Center show Plaintiff continued to attend counseling there throughout until August 2006, at which point she stopped showing up for her appointments. (Tr. 437–452). Counseling records from this period of time show improvement in Plaintiff's condition. For instance, in March 2006, Plaintiff reported feeling much better because her pain was controlled by medication. (Tr. 451). She was "experiencing being pain-free for the first time in a long while." (Tr. 452). By May of that year, Plaintiff's depression symptoms were reported as being "more stable" and Plaintiff was said to be interacting better with her two adult children. (Tr. 439, 440). In July, Plaintiff told counselors her mood had been more stable, she was feeling well, and she was looking for a job. (Tr. 441, 442). Kancherla S. Rao, M.D., reported her symptoms were in remission and she was making "continuous progress". (Tr. 442, 446, 451).

In January 2008, Plaintiff was hospitalized for five days for self-injurious impulses and severe agitation. (Tr. 474). She was referred for hospitalization after "a history of holding a kitchen knife to her forearm with thoughts of cutting herself." (Tr. 477). Plaintiff had reported to the emergency room stating she had homicidal ideation. (Tr. 483). The physician who treated her in the ER notified security and ordered a psychological evaluation, resulting in her being admitted. (Tr. 483–484). While hospitalized, Plaintiff reported having occasional auditory hallucinations.

13

(Tr. 477). The attending physician, Theophilus Arthur-Mensah, M.D., noted her history of trauma and diagnosed her with depression, borderline personality features, and recurrent episodes of bipolar disorder. (Tr. 474, 477). At the time of her discharge, she had a more elevated mood and was denying mutilatory impulses. (Tr. 474). She was advised to seek follow-up counseling at the Nord Center. (Tr. 474).

Plaintiff has had multiple psychological evaluations since filing her second SSI application. In May 2006, psychologist Ronald G. Smith, Ph.D., interviewed her. (Tr. 373). Dr. Smith suggested a diagnosis of major depressive disorder "in partial treatment remission". (Tr. 376). He concluded Plaintiff's ability to maintain attention and concentration is "fairly good", and her ability to follow simple one or two-step job instructions is also "good" within physical limitations. (Tr. 375–376). But he said Plaintiff "may be limited by anxiety" in her ability to relate to the public, coworkers, and supervisors. (Tr. 376).

In June 2006, Plaintiff's mental RFC was assessed by psychologist Alice Chambly, Ph.D. (Tr. 396–402). Dr. Chambly determined Plaintiff is "not significantly limited" in every ability except her ability to carry out detailed instructions, interact appropriately with the general public, and respond appropriately to changes in the workplace – but in these areas Dr. Chambly determined she is only moderately limited. (Tr. 396–397). She characterized Plaintiff's allegations as partially credible and concluded Plaintiff "should be able to carry out routine tasks in a non public environment which do not involve production quotas or unreasonable time demands." (Tr. 398). She agreed with Dr. Smith's diagnoses of major depressive disorder in partial remission. (Tr. 402).

Dr. Chambly's assessment was later reviewed and "affirmed as written" by R. Kevin Goeke, Ph.D., in December 2006. (Tr. 471). Also in December 2006, during the reconsideration process,

14

psychologist Matthew Gibson, Ph.D., reviewed Plaintiff's case file and concluded there had been "[n]o psych changes/worsening or new tx alleged" at that point. (Tr. 472).

<u>Second Application Administrative Hearing</u>

Plaintiff appeared with counsel at the hearing before the ALJ on October 21, 2008. (Tr. 209). Also appearing were Thomas Nimberger, a vocational expert (VE), and Gottfried K. Spring, M.D., a medical expert (ME). (Tr. 510).

Plaintiff testified about her current living arrangements. She said she is divorced and lives with her mother, her two adult children, her three siblings, her sister's four minor children over whom her mother has custody, and her brother's family. (Tr. 513). The total number of people living in her house, she estimated, is sixteen (Tr. 514).

Plaintiff testified she has a high school diploma (Tr. 514), though records from her high school (as well as reports from psychological evaluations and counseling) plainly contradict this (Tr. 102, 133, 233, 373). She later clarified that "[i]t was home school" she was referring to. (Tr. 517). In addition, she said she took an online course to become a veterinary technician, and received a certificate sometime between 2000 and 2002. (Tr. 514–515). She said she last worked as a housekeeper, but quit around 2005 when she fell and broke her wrist. (Tr. 515–516). Before that job, she delivered newspapers seven days a week. (Tr. 516). She said she also has work experience as a restaurant manager and a cashier at a dollar store. (Tr. 517).

When asked why she feels she cannot work, Plaintiff replied, "Pain pretty much." (Tr. 518). She explained she has two bad discs in her back, neuropathy from her diabetes, and trouble concentrating. (Tr. 518). Plaintiff's back problems stem from a three-week period sometime around 2005 when she fell twice and fractured her back in the process. (Tr. 518). She said the pain prevents

15

her from sleeping much, and "walking kills" her. (Tr. 519). She also said the weather makes her pain worse. (Tr. 519). She testified she takes morphine twice a day for her pain and "pretty much live[s] on a heating . . . pad." (Tr. 520–521). Aside from her back problems, Plaintiff said she has had problems with her shoulder after tearing a nerve in it. (Tr. 528). She gets cortisone shots in her shoulder about every six months. (Tr. 529).

Plaintiff also testified about her neuropathy. She said her hip goes numb and she has tingly, sharp pains on her right side. (Tr. 521). This occurs constantly, and she takes Neurontin three times a day for it. (Tr. 521). Further, Plaintiff said her depression prevents her from working. (Tr. 522). She said she "just kind of pull[s] away from everything", and admitted to being a cutter. (Tr. 522). She has been treated for depression off and on since she was fourteen. (Tr. 523). She was first hospitalized for this in January 2008 after cutting her arms and legs, but she testified she has been doing it since she was a teenager. (Tr. 522–523). She testified she takes Prozac and Wellbutrin for her depression. (Tr. 544).

Plaintiff testified her diabetes is not controlled because she lost her insurance. (Tr. 523). Her diabetes medications are too expensive for her even with her discount card from the Ohio Department of Job and Family Services. (Tr. 528). She also said she has asthma, though this impairment is controlled. (Tr. 536).

Plaintiff testified about a typical day for her. She said she usually gets up, eats breakfast, then goes upstairs to visit with her mother for a little bit. (Tr. 524). After that, she goes back downstairs "on the heating pad. And that's pretty much it." (Tr. 524). She likes to listen to the television without really watching it. (Tr. 524). Plaintiff used to do crafts and read, but she testified she does neither of these things anymore because of her inability to concentrate. (Tr. 525). She is able to bathe

herself, and she will prepare a meal once in a while. (Tr. 525, 526).

Plaintiff said she really does not go out anywhere. (Tr. 524). She is "lucky to get out like once a month" other than for her doctor's appointments. (Tr. 525). When she does go out, it is usually just to "grab personal items". (Tr. 529). Her mother does the grocery shopping. (Tr. 526). When asked about her inability to concentrate, Plaintiff said her mind will "just either wonder off or" it will "just go blank". (Tr. 526). She said her pain sometimes gets so bad that she just does not want to do anything. (Tr. 526). Plaintiff testified she does no lifting in her everyday life. (Tr. 527). She said she cannot even carry a gallon jug of milk. (Tr. 528).

Dr. Spring, a board-certified psychiatrist, testified as the ME. (Tr. 530). In terms of her physical impairments, Dr. Spring questioned whether the record actually establishes she has neuropathy. (Tr. 533). He opined that Plaintiff "tends to be quite somatic" and her pain has a "psychiatric overlay". (Tr. 533). To support this, he suggested there is "some discrepancy between the severity of the pain and the degree, the anatomical neurological degree of the damage." (Tr. 534–535). But yet, Plaintiff's psychiatric treatment has been "kind of sporadic" compared to her pain treatment. (Tr. 535).

Dr. Spring noted Plaintiff has been diagnosed bipolar depressed dysthemic, which he said falls under Listing 12.04. (Tr. 533). He remarked that she had been given GAF scores of 55 and 58, indicating she is "moderately impaired" in her global functioning. (Tr. 533–534). He also noted that her stress tolerance is poor because of her borderline personality – a diagnosis Dr. Spring said is supported by her admitted cutting behavior. (Tr. 533–534).

When asked directly whether, in his opinion, any of Plaintiff's impairments, singularly or in combination, meets or equals a listed impairment, Dr. Spring said "No." (Tr. 535). He went on

17

to explain the functional limitations he would expect given Plaintiff's impairments: "Simple, low stress work . . . better from a people scant environment, where she doesn't have to collaborate with a lot of people [or have] somebody checking and watching over her." (Tr. 535). He said there is no evidence in the record inconsistent with this opinion. (Tr. 535).

The VE testified about Plaintiff's work history. He classified Plaintiff's past work as a housekeeper as medium, unskilled work. (Tr. 538). He characterized her work as a cashier and newspaper deliverer as light and semi-skilled, and her work as a restaurant manager as light and skilled. (Tr. 539). The VE further testified that Plaintiff's restaurant work "carries quite a bit" of skill transferability to other management and food preparation jobs. (Tr. 540).

The ALJ asked the VE to assume Plaintiff has an RFC to perform sedentary work, sitting up to one and a half to two hours at a time before needing a brief stretch break, with no work above the shoulder level, no occupational driving, not having to meet high production quotas, being limited to superficial interaction with other people, and having to avoid exposure to extreme temperatures, wetness, humidity, fumes, odors, dusts, gases, and poorly ventilated areas. (Tr. 540–541). Given such an RFC, the VE testified Plaintiff could not perform any of her prior work. (Tr. 541). However, he said such an individual could perform "a lot of clerking jobs". (Tr. 541). The VE offered the examples of credit reference clerk, mailing house clerk, and cafeteria cashier. (Tr. 541–542). Together, these account for more than a million jobs nationally and roughly 2,320 jobs in northern Ohio. (Tr. 542–543).

The ALJ then altered his hypothetical, assuming the same individual only with the additional restriction of having to miss various days or hours of work at unpredictable times due to pain. (Tr. 543). Such an individual, the VE testified, would not be able to perform any work. (Tr. 543).

18

Second Application Decision

The ALJ issued an unfavorable decision on January 15, 2009. (Tr. 12–22). He determined Plaintiff has the severe impairments of diabetes mellitus, partial interstitial tear of the right shoulder, low back pain due to pars interarticular defect of L5, bipolar disorder with depression, dysthymic disorder, and borderline personality disorder. (Tr. 17). None of these, nor the combination of them, meet or equal a listed impairment, the ALJ concluded. (Tr. 17). The ALJ found Plaintiff has transferable work skills and an RFC to perform sedentary work with certain limitations. (Tr. 20–21). Deferring to the VE's suggested jobs, the ALJ concluded there are thousands of jobs in the regional economy Plaintiff could still perform, thus leading to a finding of not disabled. (Tr. 21–22).

Plaintiff thereafter requested review of the ALJ's decision. (Tr. 10). The Appeals Council denied Plaintiff's request for review the same month, making the ALJ's denial the final decision of the Commissioner. (Tr. 7). Plaintiff subsequently filed the instant lawsuit.

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a

preponderance of the evidence supports a claimant's position, the Court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

**STANDARD FOR DISABILITY**

Eligibility for SSI is predicated on the existence of a disability. 42 U.S.C. § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The Court considers the claimant's residual functional capacity, age,

20

education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)–(f), 416.920(b)–(f); *see also Walters*, 127 F.3d at 529.

### DISCUSSION

Plaintiff challenges the ALJ's decision on six grounds. She makes the following arguments:

[1]  The ALJ erroneously failed to evaluate examining psychologist Dr. Smith's opinion about simple one- and two-step instructions.

[2]  The ALJ erroneously failed to evaluate psychologist medical expert Dr. Spring's opinions about low stress and observation of Plaintiff.

[3]  The ALJ erroneously failed to evaluate three opinions from the non-examining state agency psychologists.

[4]  The ALJ's hypothetical question erroneously omitted a specification of Plaintiff's education.

[5]  Substantial evidence does not support the ALJ's finding that the VE's testimony was consistent with the DOT.

[6]  Substantial evidence does not support the ALJ's credibility finding to the extent that it was adverse and reviewable.

(Doc. 13, at 4, 8, 10, 11, 12, 14).

For the reasons explained below, the Court finds none of these arguments meritorious. They are addressed in turn.

Dr. Smith's Opinion

Plaintiff argues the ALJ harmfully erred by not properly evaluating the opinion of Dr. Smith. Specifically, Plaintiff takes issue with the ALJ's treatment of Dr. Smith's opinion about Plaintiff's ability to follow simple one- and two-step instructions.

Dr. Smith is a clinical psychologist who examined Plaintiff in June 2006 to provide a psychological evaluation for the Bureau of Disability Determination. (Tr. 373–376). In his evaluation, he wrote the following relevant passage with respect to Plaintiff's RFC:

> Her ability to maintain attention and concentration appears to be fairly good. Her ability to follow simple one or two step job instructions would appear to be good within physical limitations. Her ability to relate to the public, coworkers[,] and supervisors may be limited by anxiety which occurs when she has to go out or is in the company of a large number of people.

(Tr. 375–376). Plaintiff argues this cannot be substantial support for the ALJ's finding that Plaintiff could perform the jobs of credit reference clerk, envelope stuffer, and cafeteria cashier because the DOT classifies each of these jobs at reasoning levels that require more than simple one- or two-step instructions. (Doc. 13, at 6–7); (Tr. 21); DICTIONARY OF OCCUPATIONAL TITLES, 1991 WL 688702, Appendix C, §§ 209.362-018, 209.587-010, 211.462-010.

As Plaintiff notes, the ALJ is required to evaluate every medical opinion in the record. 20 C.F.R. § 416.927(d). To do this, several factors such as examining and treatment relationship are taken into consideration. 20 C.F.R. § 416.927(d). But the problem with Plaintiff's argument about Dr. Smith is apparent on its face: Dr. Smith did not opine Plaintiff would be incapable of jobs requiring more than one- or two-step job instructions. Plaintiff essentially argues the Court should infer Dr. Smith's opinion describes a ceiling on Plaintiff's reasoning level. However, no such indication is given by his evaluation. Indeed, that seems inconsistent with other parts of his observations, such as the fact Plaintiff "could count backwards from 20 to 1 in 16 seconds, say the alphabet in 8 seconds, and count from 1 to 40 by threes in 46 seconds, all with no errors." (Tr. 375). Dr. Smith's evaluation simply gives no indication he thought Plaintiff would be incapable of more than one- or two-step instructions.

Had Dr. Smith instead characterized this ability as something less than good, perhaps labeling it as merely questionable, then Plaintiff's argument would require more analysis.[1] But no such inference can be drawn from Dr. Smith's opinion, and therefore any failure to properly evaluate the opinion under 20 C.F.R. § 416.927(d) was harmless; the ALJ's conclusion was fully consistent with Dr. Smith's opinion about one- and two-step instructions. *See Wilson v. Commissioner of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004) ("[I]f the Commissioner adopts the opinion of [a medical] source or makes findings consistent with the opinion, it may be irrelevant that the ALJ did not give weight to [it], and the failure to give reasons for not giving such weight is correspondingly irrelevant.").

Dr. Spring's Opinions

Plaint next argues the ALJ failed to properly evaluate the testimony of the ME. Specifically, Plaintiff argues that because of the ME's testimony, the ALJ should have incorporated into her hypothetical questions to the VE the limitation of having a low stress job. And, Plaintiff argues, because the ALJ has a duty to ask an accurate hypothetical question to satisfy the Commissioner's burden at Step Five, this was harmful error. Plaintiff is incorrect, however.

The regulations specify how medical expert testimony must be handled:

Administrative law judges are responsible for reviewing the evidence and making findings of fact and conclusions of law. They will consider opinions of State agency medical or psychological consultants, other program physicians and psychologists, and medical experts as follows: . . .

(ii) Administrative law judges may also ask for and consider opinions from medical experts on the nature and severity of your impairment(s) and on whether your impairment(s) equals the requirements of any [listed impairment]. When

---

1. This argument would likely still fail, though. There are other medical opinions in the record substantiating the ALJ's RFC determination. (Tr. 396–402, 471).

> administrative law judges consider these opinions, they will evaluate them using the
> rules in paragraphs (a) through (e) of this section.

20 C.F.R. § 416.927(f)(2). Sections (a) through (e) require the ALJ to weigh any medical evidence according to various factors, and reserve certain issues to the Commissioner. 20 C.F.R. § 416.927(a)–(e). So ultimately, medical expert testimony given at a hearing before an ALJ is assessed like any other medical evidence in the record.

Here, Dr. Spring was asked to testify about functional limitations he would expect given Plaintiff's medical history, and said, "Simple, low stress work in a probably a [sic] better from a people scant environment, where she doesn't have to collaborate with a lot of people, have, you know, somebody checking and watching over her. I don't think she could tolerate that." (Tr. 535). Plaintiff points out that the ALJ did not ask the VE for low-stress jobs, and therefore argues that the ALJ posed an inaccurate hypothetical.

This argument fails for two reasons. First, the ALJ *did* effectively specify an RFC requiring a low-stress job in her hypothetical to the VE. She asked the VE to assume Plaintiff could perform sedentary work and would be restricted to work characterized as "simple, routine, no high production quotas, limited as superficial interaction with supervisors, co-workers, and the public." (Tr. 540–541). That is, the ALJ essentially repeated the "simple, low-stress" restriction suggested by Dr. Spring. The restriction of not having high production quotas implies a low-stress job. Plus, the ALJ included in his hypothetical the restriction of a simple job with only superficial interaction with other people, fully consistent with Dr. Spring's opinion that she could not tolerate "somebody checking and watching over her." (Tr. 534). The ALJ did, in fact, incorporate Dr. Spring's limitations into her hypothetical question of the VE.

Second, the ALJ's final determination of Plaintiff's RFC specifically incorporated Dr.

24

Spring's limitations: "I find that [Plaintiff] has the residual functional capacity to perform sedentary work . . . and she is limited to simple[,] routine tasks, no high production work, and [Plaintiff] must have limited and superficial interaction with supervisors, co-workers[,] and the public. (Tr. 19). Moreover, at least one of the jobs the ALJ ultimately found Plaintiff could still perform – envelope stuffer – is, in fact, classified consistently. According to the DOT, the job of envelope stuffer (officially called envelope addresser or addressing clerk) involves "performing repetitive or short-cycle work" and "not significant" instruction-taking. DOT § 209.587-010. So once again, because the ALJ's findings were consistent with Dr. Spring's opinion, any failure to articulate the precise weight given Dr. Spring's opinion is harmless. *See Wilson*, 378 F.3d at 547.

Drs. Chambly and Goeke

Plaintiff also takes issue with the ALJ's treatment of the assessments by Drs. Chambly and Goeke. Plaintiff essentially makes the same argument she made with respect to the opinion of Dr. Smith, asserting that the ALJ's RFC determination was inconsistent with the opinions of Drs. Chambly and Goeke, and that the ALJ arrived at his conclusion without properly evaluating these opinions. For much the same reason as before, Plaintiff is incorrect.

Dr. Chambly completed a mental RFC assessment in June 2006. (Tr. 396–402). In it, Dr. Chambly made the following observations:

> At the consult exam she showed appropriate affect with good range of affect. She had appropriate reality contact. She was able to remember 5 digits forward and 3 backward. She drives and drove herself to the exam. She does household chores. Her daughter shops, [Plaintiff] reports anxiety around people. At the exam attention and concentration were good. Her ability to follow one and two step directions was good. Relating to the public and in the work environment appears to be limited by anxiety. Withstand stress also appears moderately limited by depression and anxiety. She should be able to carry out routine tasks in a non public environment which do not involve production quotas or unreasonable time demands.

25

(Tr. 398). Later, in December 2006, Dr. Goeke "affirmed as written" this assessment. (Tr. 471).

First, this passage from Dr. Chambly's assessment does *not* state an opinion that Plaintiff is limited to following only one- or two-step instructions. Instead, it reports that during Dr. Chambly's examination of Plaintiff, Plaintiff was able to follow Dr. Chambly's one- and two-step instructions. In fact, just as with Dr. Smith, Plaintiff essentially asks the Court to infer from these opinions a ceiling on Plaintiff's RFC which the provider in question did not make explicit. Here again, the Court cannot read into this opinion a restriction that is not even remotely implied. Just like Dr. Smith, Dr. Chambly said Plaintiff's ability to follow one- and two-step instructions was "good." That says nothing, however, about Plaintiff's ability to do more complex tasks.

Second, Plaintiff argues the ALJ did not restrict Plaintiff to a non-public environment, as suggested by Dr. Chambly. But the Court is convinced the ALJ did, in fact, provide what amounts to just such a restriction, both in his hypothetical to the VE and his final RFC determination. In her hypothetical to the VE, the ALJ restricted Plaintiff to "superficial interaction with supervisors, co-workers[,] and the public." (Tr. 541). Similarly, in her opinion, the ALJ determined Plaintiff has an RFC that allows for sedentary work but said she "must have limited and superficial interaction with supervisors, co-workers[,] and the public." (Tr. 19). This accommodates Dr. Chambly's suggested restriction of a non-public environment.

Third, Plaintiff maintains there is a difference between "production quotas or unreasonable time demands" and "high production work", but the Court believes this distinction immaterial. Dr. Chambly opined Plaintiff should be able to carry out routine tasks which "do not involve production quotas or unreasonable time demands". (Tr. 398). In her decision, the ALJ determined Plaintiff's RFC requires "no high production work". (Tr. 19). The Court believes this is substantively

26

indistinguishable from the combination of limitations proposed by Dr. Chambly: "no production quotas" and no "unreasonable time demands". If the ALJ had intended to accommodate only the no production quotas restriction but not the reasonable time demands restriction, he would have used the phrase "production quotas" instead of "high production work". Use of the word "work" instead of "quotas" shows the ALJ meant something more than merely quotas, and use of the modifier "high" further suggests the ALJ incorporated the concept of unreasonableness into his restriction. The Court believes the ALJ's ultimate conclusion was consistent with Dr. Chambly's – and thereby Dr. Goeke's – opinion. Therefore, as with the opinions discussed above, any failure to articulate the precise weight given Dr. Chambly's or Dr. Goeke's opinions is harmless. *See Wilson*, 378 F.3d at 547.

All of this overlooks the fact that the ALJ may well have evaluated these respective medical opinions without overtly stating his reasoning. Ample case law shows "an ALJ is not required to discuss every piece of medical opinion evidence", so long as enough is discussed to enable reviewing courts to determine whether substantial evidence supports the decision. *See Karger v. Comm'r of Soc. Sec.*, 414 F. App'x 739, 754 (6th Cir. 2011). "[A]n ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." *Daniels v. Comm'r of Soc. Sec.*, 152 F. App'x 485, 489 (6th Cir. 2005) (citing *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004)); *see also Baranich v. Barnhart*, 128 F. App'x 481, 488–489 (6th Cir. 2005). Here, in determining Plaintiff's RFC, the ALJ discussed emergency room records, records from the Family Care Center, records from Dr. Shah at the Comprehensive Pain Care Center, various x-rays and CT scans, and Plaintiff's own testimony about her residual abilities. (Tr. 19–20). In a previous section of his opinion, analyzing whether Plaintiff's

27

impairments meet or equal a listed impairment, the ALJ discussed the opinions of Dr. Smith, records from Community Health Partners, records from the Nord Center, and the testimony of Dr. Spring. (Tr. 18). The ALJ certainly discussed enough medical evidence to enable this Court to determine whether her decision is supported by substantial evidence.

Furthermore, undercutting all of Plaintiff's arguments about the treatment of various medical opinions, the Sixth Circuit has said that an "ALJ is not required to mirror a medical report to a vocational expert in order to accurately state a claimant's relevant impairments." *Miracle v. Comm'r of Soc. Sec.*, 43 F. App'x 895, 897 (6th Cir. 2002) (citing *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988)). This firmly supports the Court's conclusion that the ALJ's hypothetical questions and actual RFC determination were substantively consistent with all of the above-mentioned medical opinions. The ALJ did not err in her treatment of these medical opinions.

The ALJ's Hypothetical Question

Plaintiff argues the ALJ's hypothetical question wrongfully omitted any specification of Plaintiff's education. This was necessary, Plaintiff asserts, because the ALJ relied on the VE's testimony to reach her Step Five decision of not disabled. But this argument fails because it is apparent from the hearing transcript that the VE was aware of Plaintiff's educational background.

The Commissioner cites *Chandler v. Sec'y of Health and Human Servs.*, 1994 WL 669670, at *3 (6th Cir. 1994), to argue that the ALJ's failure to specify Plaintiff's education level is irrelevant because the VE knew Plaintiff's educational background from testimony and his review of the record. Plaintiff cites no authority to further her argument, and the Court finds *Chandler* to be directly on-point. In *Chandler*, the claimant argued the ALJ improperly relied on VE answers to a hypothetical question that did not specifically mention various aspects of the claimant's

28

educational background. *Id.* The Sixth Circuit said:

> [A]lthough the question made no specific reference to [the claimant's] borderline IQ, reading disorder, or illiteracy, the vocational expert was aware of these conditions due to [the claimant's] own testimony. Further, [the claimant] could have questioned the expert concerning the impact of these specific factors. We conclude that the administrative law judge's consideration of the hypothetical question posed and the vocational expert's response was appropriate.

*Id.* Here, the VE testified after Plaintiff, who discussed her educational background extensively on the record. Plaintiff testified she has a high school diploma (Tr. 514), even though other records in the transcript indicate this is not the case (Tr. 102, 133, 233, 373). She clarified this by saying she was home schooled. (517). She even testified about further education she received, saying she received a certificate sometime between 2000 and 2002 from completing an online veterinary technician course. (Tr. 514–515). The VE testified he heard Plaintiff's testimony. (Tr. 537). He also testified he had studied the record made available to him, which presumably included the above-referenced records detailing Plaintiff's formal education. (Tr. 537). Plaintiff did not question the VE about the impact of her educational level on his opinions. Following *Chandler*, the Court finds no harmful error in the ALJ's omission of Plaintiff's specific educational background.

The VE's Testimony

Plaintiff argues the ALJ erred by failing to fulfill her duties under Social Security Ruling 00-4p. That is, Plaintiff asserts the ALJ failed to explain in her opinion her resolution of two conflicts between the DOT and the VE's testimony about the jobs of cafeteria cashier and credit reference clerk.

Generally speaking, a VE's testimony identifying specific jobs available in the regional economy that an individual with the claimant's limitations could perform can constitute substantial evidence supporting a Step Five determination that the claimant can perform other work. *Wilson v.*

*Comm'r of Soc. Sec.*, 378 F.3d 541, 549 (6th Cir. 2004). Nonetheless, SSR 00-4p imposes an affirmative duty on the ALJ when a VE's testimony is inconsistent with the DOT. In the first place, the ALJ is required to ask the VE whether his testimony is consistent with the DOT. SSR 00-4p, 2000 WL 1898704, at *2. Then, if there is an apparent conflict between the two, the ALJ is required to obtain a reasonable explanation for the conflict. *Id.* The ALJ must then explain her resolution of the conflict in her decision. *Id.*

> Here, the VE first testified about the occupation of credit reference clerk:

> Such a hypothetical person could be a, a lot of clerking jobs. I'll, I'll mention credit reference clerk, someone calling establishments, checking on information in a credit reference. . . . That is best characterized as 209.362-018. It's unskilled work. The DOT lists it as a level three. The difference between a level three and level two can be just one minute of training. Most people pick that job up within the 30 days of training provided whether or not they're going to get the job. It's simple telephone work.

(Tr. 541–542). The DOT does, in fact, characterize the job of credit reference clerk as having an SVP (specific vocational preparation) level of three, requiring up to three months of specific training. DOT § 209.362-018.

> Then, with respect to the job of cafeteria cashier, the VE testified:

> A cashier in a cafeteria setting 211.462-010, level two, unskilled. Again the DOT would list most cashiering jobs as, as, as light. But there's significant numbers of those that are sedentary as well, like the say the person letting us in and out of the garage, that cashiering gate guard position. They're sitting 99 percent of the day. I didn't cho[o]se that one because of the weather conditions that were in the hypothetical. But that job is, and I'll quote numbers for sedentary level two, unskilled, would be 1,000 local, and 450,000 nationally for that hypothetical.

(Tr. 542–543). As explained by the VE, the DOT does, indeed, classify the job of cashier as light work. DOT § 211.462-010.

> The ALJ explicitly asked the VE whether there were any conflicts between his testimony and

30

the DOT. (Tr. 543). The VE responded, "[j]ust the two that I mentioned, one concerning the strength capacity, and the other concerning the SVP." (Tr. 543). In other words, the VE reiterated that the DOT classifies the job of credit reference clerk as more skilled than he thinks it is, and classifies the job of cashier as light when he believes many cashier jobs are actually sedentary.

To complicate things, the ALJ perhaps missed the SSR 00-4p mark somewhat by not technically complying with her duty to explain her resolution of these conflicts. While using the VE's jobs numbers, the ALJ did not explain that the VE disclosed a conflict with the DOT and she resolved it in favor of his testimony. (Tr. 21). Instead, the ALJ mistakenly said there were no conflicts between the DOT and the VE's testimony. (Tr. 21).

The Court is satisfied that this technical error by the ALJ is harmless and requires no remedy. SSR 00-4p provides as an example of a reasonable explanation to resolve a conflict that "[t]he DOT lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings. A VE . . . may be able to provide more specific information about jobs or occupations than the DOT." SSR 00-4p, 2000 WL 1898704, at *2. Indeed, a VE has the ability to craft his answer in response to an individualized hypothetical RFC with potential limitations unforeseen by the DOT. *See Beinlich v. Comm'r of Soc. Sec.*, 345 F. App'x 163, 168 (6th Cir. 2009) ("[An] ALJ may choose to rely on the VE's testimony in complex cases, given the VE's ability to tailor her finding to an 'individual's particular residual functional capacity'").

It is apparent from the hearing transcript and the ALJ's opinion that this is what happened here, even though the ALJ did not expressly explain it. The ALJ accepted and relied on the VE's testimony because he gave more specific information about an occupation, at least with respect to

31

the job of cashier. That is, the VE specified there are significant numbers of sedentary cashiers (Tr. 542); the DOT lists the job as light because *some* cashier jobs are light, and the DOT lists the maximum exertional requirements for each occupation. The VE even specified a lower number of available positions in light of his limiting of the cashier occupation. (Tr. 542). In such a situation, it would make no sense to require remand merely to force the Commissioner to acknowledge a conflict, explain the above, and then make another denial for the same reasons. This error is immaterial, even disregarding the job of envelope stuffer, with which Plaintiff does not argue.

In addition, a violation of SSR 00-4p does not automatically require remand. *See Brown v. Barnhart*, 408 F. Supp.2d 28, 35 (D.D.C. 2006) ("Even if SSR 00-4p places an affirmative duty on the judge, such a procedural requirement would not necessarily bestow upon a plaintiff the right of automatic remand where that duty was unmet."); *Boone v. Barnhart*, 354 F.3d 203, 206 (3rd Cir. 2003) ("[w]e do not adopt a general rule that an unexplained conflict between a [VE's] testimony and the DOT necessarily requires reversal"); *Carey v. Apfel*, 230 F.3d 131, 146–147 (5th Cir. 2000) ("[C]laimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing.").

The Sixth Circuit briefly visited this issue via an informative footnote in *Kyle v. Comm'r of Soc. Sec.*, 609 F.F3d 847 (6th Cir. 2010). In *Kyle*, the court highlighted an opinion from this Court that dealt with the harmfulness of the Ruling's violations:

> [In *Austin v. Comm'r of Soc. Sec.*, 2010 WL 1170630, at *3 (N.D. Ohio 2010)], the claimant was limited to unskilled jobs. The VE testified there were three unskilled jobs he could perform and offered the DOT numbers for them. However, one of the DOT numbers described a job that was semi-skilled. This would have required the

32

ALJ to perform an SSR 00-4p inquiry regarding the conflict between the VE's testimony and the DOT description of the job. The court held it was harmless error, however, as the other two positions the VE described were unskilled jobs. The type of conflict the [SSR 00-4p] inquiry anticipates is not between the type of jobs claimant performed in the past and that which the VE opines his skills can transfer to in the future, but a conflict between the type of jobs the claimant has been determined by an MD and VE to be able to perform and the DOT description of the capabilities and skills required to do the job.

*Kyle*, 609 F.3d at 853 n.9.

This is analogous to instant case. Here, the ALJ's error here is harmless because of the third occupation of envelope stuffer. There were no apparent conflicts between the DOT and the VE's testimony about the job of envelope stuffer, and therefore no failure to follow SSR 00-4p with respect to this occupation. So even if the jobs of cafeteria worker and credit reference clerk were disregarded, the Commissioner still could have met his burden at Step Five with the occupation of envelope stuffer, making any technical SSR 00-4p error with respect to the other jobs harmless.

<u>The ALJ's Credibility Finding</u>

Finally, Plaintiff argues the ALJ's credibility determination lacks supporting substantial evidence in the record. The Court disagrees.

The "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). An ALJ's credibility determinations about the claimant are to be accorded "great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.' However, they must also be supported by substantial evidence." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004) ("[W]e accord great deference to [the ALJ's] credibility determination.").

33

Social Security Ruling 96-7p clarifies how an ALJ must assess the credibility of an individual's statements about pain or other symptoms:

> In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment that can be shown by the objective medical evidence alone, 20 C.F.R. § 404.1529(c) and § 416.929(c) describe the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements:
>
> 1. The individual's daily activities;
>
> 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
>
> 3. Factors that precipitate and aggravate the symptoms;
>
> 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
>
> 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
>
> 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
>
> 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3.

Here, the ALJ determined Plaintiff's "statements concerning the intensity, persistence, and limiting effects of her symptoms" were not credible to the extent they are inconsistent with the RFC the ALJ concluded Plaintiff has. (Tr. 19). She explained her reasoning for this finding by summarizing several medical records in the file and then comparing them to Plaintiff's testimony:

> [Plaintiff] alleges that she is disabled by her back and shoulder pain. . . . On physical examination, the evidence indicates that [Plaintiff] has tenderness at the sternum and decreased range of motion of the right shoulder but otherwise, her physical

34

examinations have been normal. She testified at her hearing that she cannot even lift one gallon of milk. She stated that she makes breakfast and watches television but that her daughter must assist her with dressing. She stated that she does not do many household chores. She indicated that she has her mother driver her places. She stated that she spends much of the day using a heating pad. The objective evidence in the record set forth above which demonstrates minimal findings establishes, however, that these limitations are self-imposed. Therefore, it can be concluded that while [Plaintiff] has a condition which would reasonably be expected to produce the symptoms which [Plaintiff] has alleged, they would not be of disabling severity.

(Tr. 20) (citations omitted). On review, this credibility assessment is supported by substantial evidence.

First, medical reports about examinations of Plaintiff's back and shoulders fail to suggest she has pain of disabling severity. When Plaintiff visited the ER complaining of shoulder pain in September 2005, the ER's records show she had a limited range of motion, but no swelling or deformity. (Tr. 347, 351). This was consistent with Plaintiff's trip to the emergency room two months beforehand, when she complained of back and shoulder pain but treatment providers reported no pain on palpation and normal x-rays, and discharged her with Darvocet. (Tr. 339, 344–345).

Plaintiff followed up with Dr. Griggs after the September 2005 emergency room trip. Dr. Griggs found some mild acromioclavicular joint arthrosis and mild thickening in the tendon structures of the rotator cuff. (Tr. 360). Dr. Griggs noticed a focus of fluid signal within the tendon, "suggesting a very small interstitial tear." (Tr. 360). The final impression Dr. Griggs reported was "some tendinopathy and possibly some partial interstitial tearing in the supraspinatus tendon, but no evidence of a full thickness tear". (Tr. 360). This supports the ALJ's determination that examinations of Plaintiff have shown only minimal findings.

Second, Plaintiff has undergone several x-rays, CT scans, and MRIs that showed less than

severe impairments. For example, Plaintiff had X-rays of her cervical spine taken at the emergency room in July 2005 after complaining of shoulder and back pain. (Tr. 343). These x-rays showed a satisfactory alignment with disc spaces maintained and intact bones and soft tissues. (Tr. 343). Similarly, a September 2005 MRI of Plaintiff's shoulder revealed "*mild* acromioclavicular joint arthrosis" and "*minimal* inferior acomion spur formation." (Tr. 395) (emphasis added). Also, a CT scan of Plaintiff's lumbar spine in November 2005 showed no evidence of significant disc bulging, protrusion, or compression at L1-L2 or L2-L3. (Tr. 355). It showed only minimal posterior bulging at L4-L5, without compression or stenosis. (Tr. 355). Dr. Shah saw some deformity and fragmentation of the left L5 and signs of "some hypertrophy" and sclerosis of the right L5 pars, but concluded this showed an "acute fracture". (Tr. 357). It was not certain from this CT whether there was nerve root compression at L5 or S1. (Tr. 357). All of this imaging also supports the ALJ's determination that medical records establish only minimal findings.

Third, records from the Nord Center and Pain Care Center, where Plaintiff received continued counseling and pain management treatment, show Plaintiff's pain significantly improved with medication beginning in March 2006. (Tr. 451). Plaintiff's counselor reported Plaintiff was "experiencing being pain-free for the first time in a long while." (Tr. 452). In July of that year, Plaintiff told counselors her mood had been more stable, and she was feeling well. (Tr. 441, 442). Similarly, at Plaintiff's last visit to the Pain Center, in June 2006, she stated that her lower back pain had "greatly improved", though she still complained of severe shoulder pain and moderate pain in her right arm. (Tr. 378). Dr. Shah attributed this to bursitis that continued medication should alleviate. (Tr. 381). All of these records are inconsistent with Plaintiff's subjective allegations of disabling pain since her alleged onset date, and therefore serve as substantial support for the ALJ's

determination that Plaintiff's statements about the severity of her symptoms are not completely credible.

Fourth, facts in the record other than those alluded to by the ALJ substantiate the notion that Plaintiff's allegations are not entirely credible. Contrary to Plaintiff's contention that "the ALJ appears not to have understood that using strong narcotic pain medication supports a claimant's statements of serious pain", such narcotic use could also be suggestive of an addiction to narcotics. There is, in fact, evidence in the record that at one point, Plaintiff was ingesting three times the amount of Vicodin she was prescribed. (Tr. 391, 460). Similarly, Dr. Griggs once reported Plaintiff had been taking her brother's Vicodin. (Tr. 470). These facts do *not* necessarily corroborate Plaintiff's allegations of pain in the manner Plaintiff argues. To the contrary, a reasonable, objective reviewer of the record could view these facts as showing Plaintiff considered her pain to be worse than her physicians did. Taken in conjunction with Plaintiff's well-documented history of substance abuse (Tr. 215, 225, 232), this evidence might also lead some to conclude Plaintiff was abusing pain killers in an unauthorized and unnecessary manner. These facts did not require the ALJ to acknowledge corroboration with Plaintiff's subjective allegations.

Furthermore, Plaintiff's allegation that she has not been able to work since June 2005 due to disability is called into question by her counseling records which indicate she was actively interviewing for jobs in July 2006. (Tr. 441). Also, record evidence suggests Plaintiff exaggerated her education level at the hearing. Despite testifying she completed a high school diploma (Tr. 514), no evidence in the record shows she ever earned a GED[2], and ample evidence shows she ended her

---

2. In fact, one record in the transcript reports Plaintiff "never obtained her GED although she thought of it and did sign up but never followed through." (Tr. 133).

formal education no later than after the tenth grade, at age sixteen (Tr. 102, 133, 233, 373). In sum, there is substantial evidence supporting the ALJ's conclusion that Plaintiff's allegations are not entirely credible.

Plaintiff argues the ALJ should have made a credibility finding as to Plaintiff's mental condition. However, the ALJ examined the medical evidence of Plaintiff's medical impairments thoroughly when analyzing whether Plaintiff's impairments meet or equal a listing. (Tr. 18–19). Reading the ALJ's opinion as a whole, it was not necessary for her to repeat these findings again in the section on Plaintiff's credibility. *See Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004) ("[I]t is proper to read the ALJ's decision as a whole[;] it would be a needless formality to have the ALJ repeat substantially similar factual analyses at [two steps]".) (citing *Orlando v. Heckler*, 776 F.2d 209, 213 (7th Cir. 1985)).

The fact the ALJ did not reject any medical opinions on the basis of Plaintiff's credibility is also immaterial. The ALJ's RFC is consistent with the medical evidence in the file, and inconsistent with Plaintiff's subjective allegations at least to some extent. It was not necessary to discount any medical opinions on the basis of Plaintiff's credibility because substantial medical evidence already suggested an RFC inconsistent with some of Plaintiff's allegations.

Neither does this Court take issue with the ALJ's evaluation of Plaintiff's activities of daily living, as required by 20 C.F.R. § 404.1529(c)(3)(i), § 416.929(c)(3)(i), and SSR 96-7p. The ALJ did, in fact, consider Plaintiff's reported activities of daily living when determining her credibility. In her opinion, the ALJ recited various daily living activities Plaintiff testified she does, and subsequently found her claimed limitations on these activities inconsistent with the objective medical evidence. (Tr. 20). The regulations merely state the ALJ must merely "consider" daily

38

activities "in addition to the objective medical evidence when assessing [credibility]"; the ALJ did not fail to satisfy this mandate. SSR 96-7p, 1996 WL 374186 at *3.

Pre-Denial Comparison

The Court notes *sua sponte* that even if it had found one of Plaintiff's arguments to be meritorious, remand likely still would not have been appropriate because there is not substantial evidence in the record supporting a finding that Plaintiff's condition so worsened after September 2004 in comparison to beforehand so as to become unable to perform substantial gainful activity. *See Casey*, 987 F.2d at 1232. In fact, the records from after September 2004 show many of the same symptoms from before that time. For instance, chest pain and tenderness to palpation in Plaintiff's sternum are nothing new, as Dr. Griggs reported them before Plaintiff's initial denial. (Tr. 467, 468). Similarly, Plaintiff was counseled for depression (Tr.149) and by her own admission was cutting herself (Tr. 522–523), had urinary tract infections (Tr. 372, 469), had recurrent costochondritis (Tr. 187, 209), and had been diagnosed with anxiety, hyperglycemia, and diabetes (Tr. 130), all well before her initial denial.

In fact, evidence suggests Plaintiff's day-to-day pain has decreased in comparison to the time before her initial denial; in March 2006, Plaintiff reported feeling much better because her pain was controlled by medication. (Tr. 451). According to Nord Center records, she was "experiencing being pain-free for the first time in a long while." (Tr. 452). For all these reasons, the ALJ's denial must be affirmed.

## CONCLUSION

Following review of the arguments presented, the record, and applicable law, the Court finds

the ALJ's decision denying benefits supported by substantial evidence. Therefore, the Commissioner's decision is affirmed.

IT IS SO ORDERED.

       s/James R. Knepp, II
United States Magistrate Judge
